STATE OF MAINE                                    SUPERIOR COURT
ANDROSCOGGIN, SS                                  CIVIL ACTION
                                                  DOCKET NO. CV-10-045
                                                  *r G)K  ~?* r */17/2011*

CITY OF LEWISTON
            Plaintiff                             RECD AUBSC 05/17/11

v.                                    DECISION AND ORDER


ROBERT R. GLADU
            Defendant / Counterclaimant


Before the court is Plaintiff City of Lewiston's ("City" or "Lewiston") motion for

summary judgment pursuant to M.R. Civ. P. 56 on Defendant Robert Gladu's ("Mr.

Gladu") counterclaims. Also before the court is Mr. Gladu's cross-motion for summary

judgment. A hearing on these motions was held on April 27, 2011. The question before

this court is whether a stormwater utility charge is a fee or a tax. For the reasons stated

below, the court concludes the assessment is a fee and not a tax. Accordingly, the court

GRANTS the City's motion and DENIES Mr. Gladu's cross-motion.

## BACKGROUND[1]

In 2006, Lewiston enacted the Stormwater Utility ordinance (the "Ordinance") in

part to address the issues of water quality and flooding resulting from stormwater

runoff, and to comply with federal and state mandates to manage such runoff. (Pl.'s

S.M.F. ¶¶ 1-2; Def.'s S. Add'l M. F. ¶ 26; Pl.'s Ex. A; Jones Dep. 11:8-13.) As reasons for

the need for a Stormwater Utility, the City Council made the following findings:

> **Sec. 74-300. Findings.**
>         Whereas the city council finds that water quality in the watersheds
> within and surrounding the city, including but not limited to watersheds
> associated with the Androscoggin River, No Name Pond, Garcelon Bog,

---

[1] At the hearing, Mr. Gladu objected to the court's consideration of documents attached to the
deposition of Mr. Jones. The court relies on all evidence presented in the parties' motions for
summary judgment that would be admissible at trial. *See* M.R. Civ. P. 56(e).

1

Jepson Brook, Hart Brook, No Name Brook, Stetson Brook, Gully Brook, Goff Brook, Moody Brook and Salmon Brook, along with their tributaries are potentially threatened by pollutants associated with existing land use and future development; and

Whereas the city council finds that poor water quality in the watershed can threaten public health, safety, and welfare; and

Whereas the existing stormwater management system is deteriorating and may be inadequate to meet existing and future needs, and flooding concerns may arise; and

Whereas requirements of the U.S. Environmental Protection Agency ("EPA") demand a comprehensive approach to municipal stormwater management, and the city wishes to take a proactive approach to these requirements; and

The city council makes the following additional findings:

• The stormwater management needs of the city have been identified in a needs analysis entitled (Stormwater/CSO Utility Feasibility Study Preliminary Results) dated April 11, 2002, by Camp Dresser and McKee, Inc. and an analysis entitled "Clean Water Act Master Plan" dated December 12, 2000, by Metcalf & Eddy ("stormwater studies") that indicate more effective stormwater management in the city would contribute to the health, safety and welfare of the residents. Further, this analysis reveals that stormwater facilities and activities associated with stormwater management provide services and benefits to all properties, property owners, residents and citizens of the city.

• Given the scope of stormwater management needs identified by the stormwater studies, it is appropriate and necessary to authorize the formation of a stormwater utility unit, as a program comprised of personnel from the city's department of public services and department of public works and with dedicated funding components, charged with the responsibility to establish, operate, maintain, control, and enhance the stormwater management programs, services, systems, and facilities of the city.

• In order to establish, operate, and maintain the stormwater infrastructure of the city, ensure the future usefulness of the existing system through additions and improvements, and provide other services associated with stormwater and watershed management, sufficient and stable funding is required for the operation, maintenance and improvement of the stormwater management programs, services, systems, and facilities of the city.

• A stormwater utility service fee schedule that efficiently takes into account impervious surface area, and uses intensity and nature of land

2

use as the most appropriate and equitable method of allocating the cost of stormwater management programs, services, systems, and facilities of the city and between and among rural and urbanized areas of the city and residential dwelling units, non-residential properties and other developed lands for governing assessments and collections of the utility.

(Pl.'s Ex. A, § 74-300.)

The Ordinance created the Lewiston Stormwater Utility (the "Utility"), and charged it with "all responsibility for providing stormwater management programs, services, systems, and facilities of the city." (Pl.'s S.M.F. ¶ 3; Pl.'s Ex. A, § 74-302(a), (c).) The Ordinance authorized the Utility "to assess and collect service fees from all persons owning land within the municipality that benefit from the services provided by the utility . . . " (Pl.'s S.M.F. ¶ 4; Pl.'s Ex. A, § 74-302.) The City Council did not authorize the Utility to collect a tax. (Def.'s Opp. S.M.F. ¶ 4; Jones Dep. 67:13-17.)

Rates for the assessment are set out in the Stormwater Utility Fee Schedule and Credit Policy. (Pl.'s S.M.F. ¶ 7; Pl.'s Ex. B.) In addition to a property's impervious surface area,[2] the assessment is also based on ownership and improvements to property. (Pl.'s S.M.F. ¶ 8; Pl.'s Rep. S.M.F. ¶ 42; Def.'s Opp. S.M.F. ¶ 8; Jones Dep. 23:7-14; Pl.'s Ex. B §§ 1.1-1.4.) The Credit Policy states:

> Based on the average square footage, the ratio of impervious surface area contained within properties within the City and the impact on the stormwater system, and in order to minimize administrative burdens and expenses, the City has determined that a flat fee for the first 2900 square feet of impervious surface is appropriate for all parcels. Each parcel in the City will be charged a base rate of $44.00 for the first 2,900 square feet of

---

[2]The Ordinance defines "impervious surfaces" as:
> *Impervious surfaces:* Impervious surfaces are those areas that prevent or impede the infiltration of stormwater into the soil as it entered in natural conditions prior to development. Impervious areas include, but are not limited to, rooftops, sidewalks, walkways, patio areas, driveways, parking lots, storage areas, compacted gravel surfaces, awnings and other fabric or plastic coverings, and other surfaces that prevent or impede the natural infiltration of stormwater runoff which existed prior to development.

(Pl.'s Ex. A § 74-303 at 74:29.)

impervious surface ... Parcels with no impervious surface ... as determined by the City will not be subject to a fee.[3]

(Pl.'s Ex. B § 1.1; Pl.'s S.M.F. ¶¶ 8-9; Def.'s Opp. S.M.F. ¶¶ 8-9.) The City does not actually measure the amount of stormwater that runs off of any particular parcel, but bases the amount of runoff based on the impervious surface area on the property. (Def.'s S. Add'l M.F. ¶ 52, *as qualified by* Pl.'s Rep. S.M.F. ¶ 52.) A property owner who fails to pay his Stormwater Fees is responsible for interest on the unpaid assessment, a minimum penalty of $200, and the City's attorneys' fees and costs of collection. (Pl.'s S.M.F. ¶ 11; Pl.'s Ex. A § 74-311(c)(1).)[4]

The Credit Policy also establishes the criteria for a property owner's eligibility for a City Stormwater Impact Credit, which is available for properties that do not impact the City's stormwater infrastructure. (Pl.'s S.M.F. ¶ 10; Pl.'s Ex. A § 74-309; Pl.'s Ex. B § 2.0.) According to the Credit Policy, a "Stormwater System Impact Credit" is available to a property owner if they can demonstrate "that no stormwater collected on and / or discharged from at least 50 percent of the impervious surface on a property reaches any part of the City's stormwater control system." (Def.'s Opp. S.M.F. ¶ 10; Pl.'s Ex. B § 2.2.) Mr. Gladu applied for and was denied this credit. (Def.'s Opp. S.M.F. ¶ 10; Gladu Aff. ¶ 9.)

In addition, the Permit Improvement Credit requires installation of a retention or detention pond or a system that collects and discharges the stormwater. (Def.'s Opp. S.M.F. ¶ 10; Pl.'s Ex. B § 2.3.) When such a system is installed then the maximum credit

---

[3] The flat fee for single-family homes and duplexes is based on the average amount of impervious surface area for property of that type in Lewiston. (Pl.'s Rep. S.M.F. ¶ 43; Jones Dep. 24:4-9.) The average single family home in Lewiston has approximately 2,900 square feet of impervious surface area. (Pl.'s Rep. S.M.F. ¶ 43; Jones Dep. 24:9-15.)

[4] Mr. Gladu attempts to qualify this statement by stating that the assessment is a tax and not a fee and therefore, a property owner is not liable for interest. (Def.'s Opp. S.M.F. ¶ 11; Gladu Answer to Pl.'s Interrogs. 2-4, 6.)

the owner may receive is "25 percent for facilities that are sized to handle the 50 year storm; a credit of 30 percent for facilities that meet the 100 year storm; and facilities providing for storms exceeding the 100 year storm will be eligible for a 35 percent credit." (Def.'s Opp. S.M.F. ¶ 10; Pl.'s Ex. B § 2.3(b).) Therefore, regardless of the expense of the system, the maximum credit available is 35 percent requiring the property owner to pay 65 percent of the stormwater assessment. (Def.'s Opp. S.M.F. ¶ 10; Gladu Aff. ¶ 18; Jones Dep. 45:9-10, 50:25-51:11.)

Mr. Gladu owns property located at 475 Pleasant Street in Lewiston. (Pl.'s S.M.F. ¶ 12.) Part of Mr. Gladu's property contains a small mall with a paved parking lot. (Pl.'s S.M.F. ¶ 13.) Stormwater is collected into a private system of storm drains before it runs off of his premises and into Hart Brook. (Pl.'s S.M.F. ¶ 14, *as qualified by* Def.'s Opp. S.M.F. ¶ 14.)[5] Hart Brook travels through Lewiston's stormwater system and ultimately discharges into the Androscoggin River. (Pl.'s S.M.F. ¶ 15; Jones Aff. ¶ 11.)

Lewiston calculated the area of impervious surface area on Mr. Gladu's property based on aerial photographs. (Pl.'s S.M.F. ¶ 16; Jones Aff. ¶¶ 12-14.) Using that figure, Lewiston assessed Mr. Gladu beginning March 21, 2007 and quarterly thereafter. (Pl.'s S.M.F. ¶ 17; Jones Aff. ¶¶ 15-16.)[6] Mr. Gladu paid $98.32, which the City applied to his stormwater assessment. (Pl.'s S.M.F. ¶ 18, *as qualified by* Def.'s Opp. S.M.F. ¶ 18.) Mr. Gladu has not made any other payments towards the assessment. (Pl.'s S.M.F. ¶ 19; Jones Aff. ¶¶ 17-18.) Lewiston claims that as of December 21, 2010, Mr. Gladu owes $9,276.75 of unpaid assessments and the interest continues to accrue. (Pl.'s S.M.F. ¶¶ 21-

---

[5] Mr. Gladu provides Lewiston with a 15' wide sewer easement. (Def.'s Opp. S.M.F. ¶ 14.)

[6] Mr. Gladu notes that the bills for the assessments were on an invoice and in the same envelope as that used by Lewiston to collect its water and sewer charges. (Def.'s Opp. S.M.F. ¶ 17; Gladu Aff. ¶ 11.)

22; Jones Aff. ¶ 19-20.)[7] Lewiston seeks $2,000 in penalties authorized under the ordinance, as well as attorneys' fees and other costs. (Pl.'s S.M.F. ¶¶ 23-24; Jones Aff. ¶¶ 21-22.) Mr. Gladu denies that Lewiston is entitled to collect a penalty, but in any event it should not exceed $200. (Def.'s S. Add'l M.F. ¶ 23.) Additionally, Mr. Gladu asserts that Lewiston is not entitled to collect a penalty for defending a counterclaim, nor is it entitled to attorneys' fees and costs. (Def.'s Opp. S.M.F. ¶ 11; Def.'s S. Add'l M.F. ¶¶ 23-24; Gladu Aff. ¶ 22.)

## DISCUSSION

### 1. Standard of Review

Summary judgment should be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. M.R. Civ. P. 56(c). In considering a motion for summary judgment, the court considers the facts in the light most favorable to the non-moving party. The court is required to consider only the portions of the record referred to and the material facts set forth in the parties' Rule 56(h) statements. *See e.g., Johnson v. McNeil*, 2002 ME 99, ¶ 8, 800 A.2d 702, 704.

When there are cross-motions for summary judgment, the rules for consideration of summary judgment are applied to each motion. *P.R. American, Ins. Co. v. Rivera-Vazquez*, 603 F.2d 125, 133 (1st Cir. 2010). The record on each summary judgment issue must be considered most favorably to the party objecting to the grant of summary judgment on that issue. *Blue Star Corp. v. CKF Properties LLC*, 2009 ME 101, ¶ 23, 980 A.2d 1270, 1276.

---

[7] According to the complaint, as of February 9, 2010, Mr. Gladu owed $7,521.38 in unpaid stormwater assessment, exclusive of interest. (Compl. ¶ 8; Compl., Ex. D.) Lewiston's complaint requests $7,521.38 plus interest, costs and fees. (Compl. ¶¶ B-D.) Mr. Gladu notes that the City never moved to amend its Complaint and that the deadline set forth in the April 26, 2010 Scheduling Order was August 16, 2010. (Def.'s Opp. S.M.F. ¶21; Gladu Aff. ¶21.)

6

'"The interpretation of a local ordinance is a question of law, and we review that determination de novo.'" *Rudolph v. Golick*, 2010 ME 106, ¶ 8, 8 A.3d 684, 686 (quoting *Logan v. City of Biddeford*, 2006 ME 102, ¶ 8, 905 A.2d 293, 295). '"Although the terms or expressions in an ordinance are to be construed reasonably with regard to both the objectives sought to be obtained and the general structure of the ordinance as a whole, we look first to the plain language of the provisions to be interpreted."' *Logan*, 2006 ME 102, ¶ 8, 905 A.2d at 295 (quoting *Gensheimer v. Town of Phippsburg*, 2005 ME 22, ¶ 22, 868 A.2d 161, 167) (internal quotations omitted)).

## 2. Whether Lewiston's Stormwater Charge is a Fees or a Tax

Whether a stormwater utility charge is a "tax" or a "fee" has never been addressed in this state. However, the Law Court has stated:

> Because both a fee and a tax raise monies for governmental use, the distinction between the two is one of purpose and of degree of particularity. In the case of licensing fees, for example, we have recognized that fees "are part of a regulatory scheme and are intended to cover costs of administering such a program under the police power of the government." *Strater v. Town of York*, 541 A.2d 938, 938 (Me. 1988). Other features that may distinguish fees from more general revenue raising devices are that fees are paid in exchange for exclusive benefits not received by the general public and are voluntary in the sense that an individual may avoid the charge by choosing not to utilize the service. *Emerson College v. City of Boston*, 391 Mass. 415, 462 N.E.2d 1098, 1105 (Mass. 1984). In addition, the amount of the fee is usually a fair approximation of the cost to the government and the benefit to the individual of the services provided. *See States v. Maine*, 524 F. Supp. 1056, 1059 (D. Me. 1981).

*Butler v. Supreme Judicial Court*, 611 A.2d 987, 990 (Me. 1992);[8] *see also Daley v. Commissioner, Dep't of Marine Resources*, 1997 ME 183, ¶ 9, 698 A.2d 1053, 1057; *Bd. of*

---

[8] *Butler* addressed, in part, a constitutional challenge to fees charged in civil cases where a jury trial was demanded. 611 A.2d at 989. The Court's opinion in *Butler* focuses on whether a civil jury fee violates the constitutional right to a jury trial, due process, and equal protection. *Id.* at 990-92. Though this case does not involve a constitutional challenge, the general principles and standard of review quoted above applies to this case. Additionally, *Butler* cites with approval the *Emerson College* case relied on, in part, by the parties.

*Overseers of the Bar v. Lee*, 422 A.2d 998, 1004 (Me. 1980).[9] Mr. Gladu, as the party seeking to avoid paying the stormwater utility charge, has the burden of proving its invalidity. *See E. Perry Iron & Metal Co. v. City of Portland*, 2008 ME 10, ¶ 26 n. 7, 941 A.2d 457, 465; *Silva v. City of Attleboro*, 908 N.E. 2d 722, 725 (Mass. 2009).

## A.     Purpose

The stormwater assessment in this case is a tax only if its primary purpose is to raise revenue. The Ordinance states:

> **Sec. 74-301. Purpose.**
> Stormwater runoff is one (1) of the largest contributors to water quality violations in urban and urbanizing areas of Maine. According to the US EPA, polluted stormwater runoff is a leading cause of impairment to the nearly forty (40) percent of surveyed U.S. water bodies which do not meet water quality standards (U.S. EPA, 1995). When polluted stormwater runoff is discharged directly into surface water bodies, several adverse effects can occur: public health can be threatened from contaminated drinking water sources, food sources, and recreational waters; aquatic habitats can be damaged or destroyed; and aesthetic values of waterways can decline.
>
> Management of stormwater is critical to ensuring the integrity of valuable surface water resources. An effective approach to managing stormwater and related impacts is creation of a utility that delivers stormwater management services to a community. Therefore, the city hereby establishes a stormwater management utility for the following purposes:
>
> • To determine the necessary level of municipal stormwater management services for the city;

---

[9] In addition to looking at whether a stormwater assessment serves a regulatory purpose rather than a revenue raising purpose, courts in other jurisdiction have also looked at: (1) whether the charge is proportionate to the necessary costs of the service; (2) whether the legislative intent in enacting the fee was to provide a service or alleviate a burden; (3) whether a relationship exists between the assessment charged and either the benefit the payor receives or the burden he produces and (4) whether the charge is voluntary. *See Bolt v. City of Lansing*, 587 N.W. 2d 264, 269 (Mich. 1998); *Covell v. City of Seattle*, 905 P.2d 324, 327 (1995); *Emerson College*, 462 N.E.2d 1098, 1105 (Mass. 1984); 1-2 Bender's State Taxation: Principles and Practice § 2.06. Recently, courts have given less weight to whether the charge is voluntary. *See Silva v. City of Attleboro*, 908 N.E. 2d 722, 727-28 (Mass. 2009). In *Silva*, the court suggested applying an alternative test discussed in *Emerson College*: '"whether the charge (1) applies to the direct beneficiary of a particular service, (2) is allocated directly to defraying the costs of providing the service, and (3) is reasonably proportionate to the benefit received."' *Silva*, 908 N.E. 2d at 728 (quoting *State v. Medeiros*, 973 P.2d 736 (Haw. 1999)).

- To maintain and improve the drainage facilities of the city, to ensure that they perform to design capacity while using best management practices to meet local, state, and federal water quality standards;

- To mitigate the damaging effects of uncontrolled and unmanaged stormwater runoff;

- To support and promote sound stormwater management practices that mitigate nonpoint source pollution, reduce flooding, and enhance area drainage within the city and;

- To support the goals and objectives of the city ordinances addressing stormwater management in other sections of this Code of Ordinances and to comply with applicable law, including the Maine Department of Environmental Protection Stormwater Management Regulations.

(Pl.'s Rep. S.M.F. ¶ 41; Pl.'s Ex. A at 74:27.) Lewiston asserts that its stormwater assessments are used solely to fund the Utility, which was created pursuant to the City's police power to maintain and improve the City's stormwater system. (Pl.'s S.M.F. ¶¶ 1-3, 5-6.)[10] Lewiston claims that revenue from the stormwater assessments is deposited into a special enterprise fund, and withdrawals from that fund are made only for expenses related to maintaining and improving the City's stormwater system. (Pl.'s S.M.F. ¶¶ 5-6.) Therefore, under Maine law, Lewiston asserts that its stormwater assessments are a fee and not a tax.[11]

---

[10] Mr. Gladu does not contest that Lewiston has the power to enact a stormwater ordinance or to create a stormwater utility.

[11] Additionally, Lewiston cites to the majority of recent cases from other jurisdictions that have looked at similar assessments and found that they are fees and not taxes. *El Paso Apartment Assoc. v. City of El Paso*, 2011 U.S. App. LEXIS 4849, 16-24 (5th Cir. Mar. 9, 2011); *Vandergriff v. City of Chattanooga*, 44 F. Supp. 2d 927, 939-41 (U.S.D.C. E.D.Tenn. 1998), *aff'd by Rush v. City of Chattanooga*, 182 F.3d 918 (6th Cir. 1999); *Cary v. Mason County*, 219 P.3d 952, 956 (Wash. Ct. App. 2009); *Storedahl Props., LLC v. Clark County*, 178 P.3d 377, 386 *review denied*, 164 Wn.2d 1018 (Wash. 2008); *Tukwila School Dist. No. 406 v. City of Tukwila*, 167 P.3d 1167, 1172-75 (Wash. App. 2007); *Church of Peace v. City of Rock Island*, 828 N.E.2d 1282, 1286 (Ill. App. 3d 2005); *McLeod v. Columbia County*, 599 S.E.2d 152, 155 (Ga. 2004); *Bd. Of Education of Jordan School Dist. v. Sandy City Corp.*, 94 P.3d 234, 242 (Utah 2004); *City of Gainesville v. State of Florida*, 863 So. 2d 138, 143-48 (Fla. 2003); *Densmore v. Jefferson County*, 813 So.2d 844, 854-55 (Ala. 2001); *Twietmeyer v. City of Hampton*, 497 S.E.2d 858, 861 (Va. 1998); *Sarasota County v. Sarasota Church of Christ, Inc.*, 667 So. 2d 180, 186 (Fla. 1996); *Roseburg School Dist. v. City of Roseburg*, 851 P.2d 595, 599 (Ore. 1993);

Mr. Gladu claims that the stormwater assessment is primarily used for revenue raising purposes because a portion of the funds goes toward debt services on capital improvements.[12] Mr. Gladu claims that the Utility commingles the stormwater funds to satisfy the obligations of the City's general fund. (Def.'s Opp. S.M.F. ¶ 5; Jones Dep. 90:25-91:3.) Specifically, Mr. Gladu claims that the Utility pays the principal and interest on debt service and bonded debt for capital improvement projects for Lewiston spanning from 1989 through 2006, predating the Utility. (Def.'s Opp. S.M.F. ¶ 5; Def.'s S. Add'l M.F. ¶¶ 30, 68, *as qualified by* Pl.'s Rep. S.M.F. ¶¶ 30, 68; Jones Dep. 91:18-93:25, 97:17-98:2, 122:9-21; Jones Dep. Ex. 12.) Prior to the creation of the Utility, the debt service for capital improvements was paid from property taxes and deposited into the general fund and itemized in the annual Lewiston budget. (Def.'s Opp. S.M.F. ¶ 5; Jones Dep. 91:18-93:25, 97:17-98:2, 122:9-21; Jones Dep. Ex. 12.)

The practical effect of Mr. Gladu's position would be that the City could never fund improvements to its own infrastructure if they were made prior to adopting a fee structure; a position and result the court declines to adopt. Additionally, Mr. Gladu puts forth no evidence that the capital improvements that predate the Utility are not used for stormwater services. After the creation of the Utility, it assumed the

---

*Long Run Baptist Assoc. v. Louisville & Jefferson County Metropolitan Sewer Dist.,* 775 S.W.2d 520, 523 (Ky. 1989); *but see City of Cincinnati v. United States,* 39 Fed. Cl. 271, 275 (Fed. Cl. 1997) (holding that, in evaluating the city's right to charge the federal government, a charge unrelated to the actual runoff from a property, but "estimated on the square footage of the government's property and on the intensity of the property's development" is a tax); *Howard Jarvis Taxpayers Assoc. v. City of Salinas,* 98 Cal. App. 4th 1351, 1354-55 (Cal. App. 4th 2002) (in construing the ordinance against finding a fee, holding that the assessment is a tax because it is related to the ownership of property and involuntary); *Dennehy v. Gresham,* 12 OTR 194, 197-98 (Or. 1992) (same).

[12] Mr. Gladu asserts that the stormwater funds are directly linked to Lewiston's mil rate. (Def.'s Opp. S.M.F. ¶ 6; Jones Dep. 37:15-39:9; Jones Dep. Ex. 52.) One of the purposes of the Utility was to provide real estate tax relief. (Def.'s S. Add'l M.F. ¶ 41; Jones Dep. 22:14-19.) However, all fees raise some revenue. The proper test is the purpose of the charge and not its effect. *Bd. of Overseers of the Bar v. Lee,* 422 A.2d at 1004 (*citing Beckendorff v. Harris-Galveston Coastal Subsidence District,* 558 S.W.2d 75, 79 (Tex. Civ. App. 1977)).

10

responsibility of providing stormwater management services that were previously provided by the City. (Pl.'s Rep. S.M.F. ¶ 29; Jones Supp. Aff. ¶¶ 4,6; Pl.'s Ex. A § 74-302(c).) At the same time, expenses related to providing those services were removed from the City's general operating budget and made the responsibility of the Utility. (Pl.'s Rep. S.M.F. ¶ 29; Jones Supp. Aff. ¶¶ 7-8.) The Utility funds the expenses necessary to provide stormwater management service through the collection of the assessment, as authorized in Lewiston's Stormwater Utility Ordinance. (Pl.'s Rep. S.M.F. ¶ 29; Jones Supp. Aff. ¶ 10; Pl.'s Ex. A § 74-302.) As the Court in *Tukwila School Dist. No. 406*, noted:

> The School District's argument that the City cannot use funds generated by fees on capital projects related to storm and surface water facilities is not persuasive. A system designed to collect, treat, and discharge water cannot exist without the infrastructure to which the School District objects. The construction of capital facilities is a recognized regulatory activity. .. Further, like sanitary sewer systems, storm and surface water systems require pipes, drains, pump stations, and other components to drain and divert the flow of surface water. The School District does not provide any evidence that the funds are not being used for the storm and surface water facilities.

167 P.3d at 1173-75.

Moreover, the intent of the City appears to be to comply with federal and state mandates regarding water quality. *Cary*, 219 P.3d at 955-56 (finding that monies collected were to be spent mainly to improve water quality in Mason County and therefore the primary purpose was regulatory, rather than a tax); *Tukwila School Dist. No. 406*, 167 P.3d at 1173; *Densmore*, 813 So.2d at 853 (finding that the primary purpose of the stormwater ordinance was to comply with the Clean Water Act and the county's NPDES permit). Lewiston recognizes that "polluted stormwater runoff is a leading cause of impairment to nearly 40% of surveyed U.S. water bodies which do not meet water quality standards." (Jones Dep. Ex. 51; Def.'s S. Add'l M.F. ¶ 52, *as qualified by*

11

Pl.'s Rep. S.M.F. ¶ 53.) Though the existing rate structure does not measure the "quality" of the stormwater that runs off, but instead measures the "quantity" based on the amount of impervious surface area on a property, (Def.'s S. Add'l M.F. ¶ 56; Jones Dep. 46:1-18,) the City determined that it is more efficient to measure the quantity of stormwater runoff than the quality. (Pl.'s Rep. S.M.F. ¶ 56; Jones Dep. 50:6-23.) Additionally, regardless of how clean the water is, the Utility still must maintain the stormwater infrastructure, including culverts, pipes, and catch basins, sufficient to handle the quantity of the stormwater runoff. (Pl.'s Rep. S.M.F. ¶ 56; Jones Supp. Aff. ¶ 8.) Therefore, the court finds that the primary purpose of the stormwater assessment is to regulate the use of the stormwater system and not to raise revenue.

## B.    Direct Relationship

The City's assessment is directly related to the costs of the regulation. The City estimates the amount of stormwater runoff based on the amount of impervious surface area on a particular parcel of land. Accordingly, assessments are based on the extent to which a payor's property burdens the City's stormwater system. (Pl.'s S.M.F. ¶¶ 7-10.) Properties that do not use the City's stormwater management services, whether because they have no impervious surface area or because stormwater does not drain from those properties into the City's system, do not pay any assessment. (Pl.'s S.M.F. ¶¶ 9-10.) *See Cary*, 219 P.3d at 955-56; *Storedahl*, 178 P.3d at 385-86; *Tukwila School Dist. No. 406*, 167 P.3d at 1175; *McLeod*, 599 S.E.2d at 153[13] (finding that a stormwater charge is a fee

---

[13] This case is distinguishable from *Fulton County Taxpayers Assoc. v. City of Atlanta*, an early case, from the Georgia Superior Court, cited by Mr. Gladu, which found that a stormwater assessment was a tax and not a fee. 1999 WL 1102795, * 1 (Ga. Super. Sep. 22, 1999). The court found that the stormwater assessment was a tax because "[r]ather than looking to any specific benefit received by a particular landowner in determining the amount to assess for the stormwater utility charge, the City ... imposed a formula which looks to the size of the parcel and the use of the property." *Id.* at *3. The court also found that the ordinance had no exceptions, and imposed a lien on the landowner's property for failure to pay. *Id.* Here, the

because, in part, "that the utility charge is used only to pay for storm water management within the designated service area, that only the facilities and systems within that area take in runoff generated within the area, with one small exception, and that the amount of impervious surface is the most important factor influencing the cost of storm water management services"); *Church of Peace v. City of Rock Island*, 828 N.E.2d at 1285 ("The record . . . established that there was a direct relationship between the imperviousness and storm water run-off, thus creating a rational relationship between the amount of the fee and the contribution of a parcel to the use of the storm water system."); *Bd. of Education of Jordan School Dist.*, 94 P.3d at 240 ("The service provided is the acceptance and handling of storm water runoff generated by school district property. This service prevents damage to property from excessive accumulations of water and from flooding . . . the impervious surfaces on school district properties contribute to the need to have and maintain such a system."); *Tweitmeyer*, 497 S.E.2d at 860; *Long Run Baptist Assoc., Inc.*, 775 S.W.2d at 523 (a charge based on the amount of impervious surface of the property "is a reasonable and rational classification . . ."); *but see Bolt*, 587 N.W.2d at 166-67 (concluding that the ordinance lacked "a significant element of regulation" because the stormwater ordinance failed to consider the presence of pollutant in the water, but merely regulated the amount of stormwater runoff).

Additionally, the monies collected from the stormwater assessment are deposited in a segregated account. (Pl.'s S.M.F. ¶ 5; Jones Aff. ¶ 6.) Monies from that fund are used solely for stormwater related expenses, including maintaining and

---

assessment is also based on the impervious surface area of the property, a property owner may qualify for credits or exceptions, and the City cannot impose a lien on the property for failure to pay.

improving Lewiston's stormwater infrastructure. (Pl.'s S.M.F. ¶ 6; Jones Aff. ¶ 7.) *Cary*, 219 P.3d at 958 (recognizing that there was a direct relationship between the fund and the regulatory purpose when the county "segregate[d] the funds the assessment generates into an account used only for water management, storm water maintenance programs, and education"); *Storedahl*, 178 P.3d at 384-85 (explaining that the assessment at issue resembled a fee because the county used the stormwater funds for the limited purpose of maintaining stormwater infrastructure, educating the public about the effects of stormwater, and other similar activities); *see also Tukwila School Dist. No. 406*, 167 P.3d at 1173.

### C.    Voluntary

Properties that do not use the City's stormwater management services, whether they have no impervious surface area or stormwater does not drain from those properties into the City's system, do not pay any assessment. (Pl S.M.F. ¶¶ 9-10.) For those properties that do use the City's stormwater management services, Mr. Gladu's assertion is that the assessment is involuntary in that the only way to avoid it is to rid the property of impervious surface areas, prevent stormwater from having an impact on the City's stormwater system or qualify for a System Impact Credit. (Def.'s S. Add'l M.F. ¶¶ 74-74, *as qualified by* Pl.'s Rep. S.M.F. ¶¶ 74-75; Gladu Dep. 30:24-31:11; Pl.'s S.M.F. ¶ 10; Pl.'s Rep. S.M.F. ¶¶ 75-77; Jones Supp. Aff. ¶¶ 18-19; Pl.'s S.M.F. Ex. B, § 2.2.) While this assertion has some merit, when viewed in juxtaposition to the other factors discussed herein, the balance tips heavily in favor of the other factors and thus a finding that the stormwater assessment is a fee. *See also Church of Peace*, 828 N.E.2d at 1286 ("Voluntary participation involves nothing more than weighing the competing costs of participation.").

## D.    Fair Approximation

Finally, Lewiston's stormwater assessment is a fair approximation of the cost to the government and the benefit to the individual of the services provided. The assessments provide landowners with the benefit of stormwater services. "[A] valid fee may be sustained based upon the indirect benefit or a public benefit to the persons assessed the fee." *Densmore*, 813 So.2d at 855.   The benefit to the property owners assessed the fee is access to the City's stormwater infrastructure.

## 3.    Attorneys' Fees

At the hearing on the parties' cross-motions for summary judgment, the court requested that the City separate out the amount of attorneys' fees incurred in prosecuting its enforcement/collection action from those incurred defending Mr. Gladu's counterclaim.  The City complied with the court's request and also presented persuasive argument that the issues raised in Mr. Gladu's affirmative defenses and his counterclaims are "inextricably intertwined."  The court agrees and finds that these broader issues, which include but are not limited to violation of statutory authority, illegal tax, violation of ordinance, equal protection, request for declaratory judgment, preliminary and permanent injunction, are far beyond the scope of the collection action contemplated in the Lewiston Code of Ordinances Chapter 74.

§ 74-311(c)(1) provides that:

> Any person that fails to pay the service fee when due shall be responsible for the amount of the unpaid service fee, interest on the unpaid amount at a rate determined by the city council as part of the stormwater utility use fee schedule, a minimum penalty of $200.00, and attorneys' fees and other costs of collection.  Delinquent amounts may be collected by a civil action against the person.

Upon review of the "Delinquent fees" provision above, the court concludes that the City's attorneys' fees are not reasonable for a collection action

on a delinquent fee. The City's interests in litigating this matter have greater implications than simply pursuing Mr. Gladu's delinquent fee. And, despite the fact that Mr. Gladu raised and pursued the issues presently before the court, he should not bear the onerous cost of challenging and/or testing the validity of the City's Stormwater Utility Fee.

Accordingly, the court finds that the City is entitled to attorney's fees and other costs of collection of the delinquent fees sought and recovered in this matter.

## CONCLUSION

The entry shall be:

> The court finds that the Lewiston Stormwater Utility Fee as enacted and as assessed is valid.
>
> Plaintiff's motion for summary judgment is GRANTED and Defendant's motion for summary judgment is DENIED
>
> Defendant is ORDERED to pay $7,619.70 in delinquent stormwater utility fees. In addition, he shall pay interest on the principal amount due in the amount of $1,197.85, which is calculated through the date of hearing, April 27, 2011, in accordance with the City's annual interest rates imposed on delinquent stormwater fees.[14] Post-judgment interest at the rate of 11.25% shall accrue from the date of this order.
>
> Defendant is ORDERED to pay a penalty of $825 for failing to pay his stormwater fees.

---

[14] The interest rates imposed by the City on delinquent stormwater fees are as follows:

| Year | Rate |
|------|------|
| 2007 | 16.5% |
| 2008 | 15.5% |
| 2009 | 12.0% |
| 2010 | 11.25% |
| 2011 | 11.25% |

16

Defendant is ORDERED to pay Plaintiff's reasonable attorneys' fees in the amount of $2,539.90 plus costs of collection in the amount of $350.

Dated: May 17, 2011

_____
MaryGay Kennedy
Justice, Superior Court

17

CITY OF LEWISTON - PLAINTIFF

Attorney for: CITY OF LEWISTON
ANNE TORREGROSSA  - RETAINED 03/04/2010
BRANN & ISAACSON
184 MAINE STREET
PO BOX 3070
LEWISTON ME 04243-3070

vs
ROBERT GLADU  - DEFENDANT

Attorney for: ROBERT GLADU
SCOTT J LYNCH  - RETAINED 04/16/2010
HORNBLOWER LYNCH RABASCO & VANDYKE
261 ASH STREET
PO BOX 116
LEWISTON ME 04243-0116

Filing Document: COMPLAINT                    Minor Case Type: OTHER CIVIL
Filing Date: 03/04/2010

## Docket Events:

03/04/2010 FILING DOCUMENT - COMPLAINT FILED ON 03/04/2010

03/04/2010 Party(s):  CITY OF LEWISTON
          ATTORNEY - RETAINED ENTERED ON 03/04/2010
          Plaintiff's Attorney: ANNE TORREGROSSA

03/04/2010 CERTIFY/NOTIFICATION - CASE FILE NOTICE SENT ON 03/04/2010

04/05/2010 Party(s):  ROBERT GLADU
          SUMMONS/SERVICE - CIVIL SUMMONS SERVED ON 03/30/2010

04/05/2010 Party(s):  ROBERT GLADU
          SUMMONS/SERVICE - CIVIL SUMMONS FILED ON 04/05/2010

04/16/2010 Party(s):  ROBERT GLADU
          ATTORNEY - RETAINED ENTERED ON 04/16/2010
          Defendant's Attorney: SCOTT J LYNCH

04/16/2010 Party(s):  ROBERT GLADU
          RESPONSIVE PLEADING - ANSWER & COUNTERCLAIM FILED ON 04/16/2010
          WITH AFFIRMATIVE DEFENSES

04/16/2010 ORDER - SCHEDULING ORDER ENTERED ON 04/16/2010
          THOMAS E DELAHANTY II, JUSTICE
          ORDERED INCORPORATED BY REFERENCE AT THE SPECIFIC DIRECTION OF THE COURT.  COPIES TO
          PARTIES/COUNSEL

04/16/2010 DISCOVERY FILING - DISCOVERY DEADLINE ENTERED ON 12/16/2010

04/16/2010 ASSIGNMENT - SINGLE JUDGE/JUSTICE ASSIGNED TO JUSTICE ON 04/16/2010
          THOMAS E DELAHANTY II, JUSTICE